*832 OPINION OF THE COURT
Kathy J. King, J.
In this guardianship proceeding, petitioner, Yakov B., moves by order to show cause for an order enjoining Fern Finkel, Esq., as the special guardian for Jane Doe,[1] an incapacitated person (IP), from withdrawing life-sustaining treatment[2] pursuant to article 29-CC of the Public Health Law, commonly known as the Family Health Care Decisions Act (FHCDA), for the IP and directing that the special guardian rehabilitate the IP. In support of the order to show cause, the father of the IP, Yakov, submits an affidavit in support. On the return date of the order to show cause, Anna B., Yakov’s wife and mother of the IP, and Bella R., the IP’s first cousin, joined in the application on the record. The movants appeared pro se on the return date. The special guardian, co-guardians, John D. and Julia S., the IP’s husband! and daughter, respectively, and Mental Hygiene Legal Service (MHLS) as attorney for Jane Doe, submit opposition to the requested relief.
Background and Procedural History
Jane Doe was born on xxxx xx, 1966 in Belarus, part of the former Soviet Union. She immigrated to the United States with her daughter, Julia, in 1993, after divorcing her first husband. Thereafter, she met John D. and moved in with him in 1996. Their son, Michael, was born on xxxx xx, 1997. The couple married in 1999. Although she worked briefly as a home attendant, Jane Doe was primarily a “stay at home mom.” On xxxx xx, 2003, Jane Doe, then 37 years old, gave birth to her third child, Elizabeth, who was delivered at Beth Israel Medical Center prematurely at seven months. Due to complications associated with her pregnancy and childbirth, on November 23, 2003, Jane Doe went into cardiac arrest during an unsuccessful intubation, resulting in respiratory failure, and anoxic encephalopathy (loss of oxygen to the brain). As a result, she suffered anoxic brain damage and spastic quadriparesis (the *833 contraction of her four extremities due to irreversible muscular and tendon damage). Presently, she is ventilator dependent requiring an endotracheal tube that attaches from the respirator through the trachea, receives artificial hydration and nutrition through a percutaneous gastrostomy (feeding tube),[3] and is classified as being in a persistent vegetative state.[4] Based on Jane Doe’s medical condition, she will require institutional care in a health care facility for the rest of her life, and currently receives total care in the ventilator unit of Rutland Park Nursing Home.
At the time of this incident, Julia was 15 years old, Michael was six years old, and both resided with Jane Doe and John D. Other than Jane Doe’s immediate family, her blood relatives include her parents, Yakov and Anna, and a brother Igor B. who is a licensed practical nurse at Resort Nursing Home’s respiratory unit. Jane Doe was previously a patient at Resort Nursing Home’s ventilator unit, where Igor was involved in her care. Bella is a close relative of Jane Doe and her family, having joined in the instant application, and appearing in court with Yakov and Anna regarding prior proceedings initiated by Igor.
In 2006, Jane Doe received a settlement of about $7.1 million as a result of a medical malpractice lawsuit against Beth Israel. Her husband, John D., received $1 million from the settlement award for loss of services. In conjunction with the settlement of the lawsuit, in 2006, John D. commenced *834 a guardianship proceeding under article 81 of the Mental Hygiene Law for the appointment of a guardian for Jane Doe. After a full hearing and upon notice to all interested parties, including Yakov and Anna, the court determined that Jane Doe is an incapacitated person within the meaning of Mental Hygiene Law § 81.02, and issued an order and judgment dated July 11, 2006. John D. was appointed personal needs guardian and Jacqueline Kadanoff, Esq., was appointed property management guardian. The order and judgment also named Yakov, Anna, and Julia as interested parties to receive notice of any further proceedings.
In 2012, after learning that John D. was about to initiate measures to remove Jane Doe from life support, Igor moved by emergency order to show cause to have John D. removed as the personal needs guardian of Jane Doe. The court, in conjunction with this application, appointed Frieda Rosengarten as Court Evaluator to investigate the allegations raised by Igor, and to reevaluate Jane Doe due to the considerable number of years that passed since her initial evaluation in 2006. By separate order, the court appointed a physician to perform an independent medical examination of Jane Doe[5] and appointed MHLS as counsel to protect Jane Doe’s interests. Lisa C. Boranian, Esq., appeared for MHLS in the 2012 proceeding, and represents Jane Doe in the instant proceeding before the court.
In opposition to Igor’s order to show cause, John D. moved by motion dated August 17, 2012 for an order determining, inter alia, that he, as Jane Doe’s personal needs guardian, is her surrogate pursuant to Public Health Law § 2994-d (1), and therefore has the authority to take appropriate steps to withdraw her from life-sustaining treatment. The respective applications of the parties served as a catalyst to extensive litigation wherein Igor was represented by Tzvi Saperstein of the law firm of Salem, Shor & Saperstein, LLP, and David C. Gibbs III of the Gibbs Law Firm, P.A., located in Seminole, Florida (appearing pro hac vice), who is particularly known for representing the parents in the well-publicized case of Terri Schiavo (Schiavo ex rel. Schindler v Schiavo, 403 F3d 1223 [11th Cir, Mar. 23, 2005]). John D. and Julia have been represented by Ira Salzman of Goldfarb, Abrandt, Salzman & Kutzin, LLP, throughout the pendency of this litigation, including the instant order to show cause.
*835 After more than a year of litigation, which included several appearances and hearings, John D., Igor, and MHLS entered into a stipulation of settlement on the record on April 17, 2013. Pursuant to the stipulation of settlement, the parties agreed that Igor’s application to remove John D. as the personal needs guardian of Jane Doe was withdrawn with prejudice, and John D.’s motion requesting an order determining that he is Jane Doe’s surrogate pursuant to Public Health Law § 2994-d (1) was also withdrawn with prejudice. In addition, the parties stipulated that John D. and Julia would serve as personal needs co-guardians and Fern Finkel, Esq., would serve as the special guardian of Jane Doe. In her capacity as special guardian, Ms. Finkel was designated as the surrogate of Jane Doe with regard to all health care decisions, including the withdrawal of life-sustaining treatment pursuant to Public Health Law § 2994-d (4) and (5).
The parties further stipulated that any decision regarding the withdrawal of life-sustaining treatment pursuant to Public Health Law § 2994-d (4) and (5) would be made by Ms. Finkel only after consultation with John D., Julia, Yakov and Anna. In the event Ms. Finkel recommended the withdrawal of life-sustaining treatment pursuant to Public Health Law § 2994-d (4) and (5), this determination would be final and binding upon the parties to the stipulation of settlement. The terms of the stipulation of settlement were memorialized in an order dated September 6, 2013 (final order).
Pursuant to the final order, the special guardian submitted a report to the family and court (the report) dated November 15, 2013, wherein she determined that Jane Doe is in a persistent vegetative state without hope of recovery and that it is not in her best interests to remain on life support. Thereafter, on December 6, 2013, the special guardian served a seven-day written notice on all interested parties of her “intention to discontinue life support.”
The Instant Order to Show Cause
On December 13, 2013, Yakov, Anna, and Bella moved by order to show cause for a temporary restraining order to prevent the implementation of the special guardian’s decision to withdraw life-sustaining treatment, and for an order requesting that “steps be taken for [Jane Doe]’s rehabilitation.” The court in granting the stay directed that a hearing was *836 required to determine the special guardian’s compliance with Public Health Law § 2994-(d) (4) and (5). The order to show cause was adjourned from January 8 to January 14, 2014 to permit the movants to retain counsel. The movants were, thereafter, represented by Mark Hus, Esq. An additional adjournment was granted for submission of opposition to the order to show cause by the parties.
The special guardian, represented by Anthony Gentile of Godosky & Gentile, PC., in opposition, argues that the order to show cause is a delay tactic. Specifically, the movants did not previously object to her designation as special guardian or her authority to act as surrogate for Jane Doe regarding the withdrawal of life-sustaining treatment pursuant to Public Health Law § 2994-d (4) and (5). In reaching her conclusion to withdraw life-sustaining treatment from Jane Doe pursuant to Public Health Law § 2994-d (4) and (5), Ms. Finkel contends that she complied with this court’s order vesting her with the authority to act as surrogate, by conducting a thorough investigation of Jane Doe’s condition, which included visiting Jane Doe on multiple occasions and interviewing medical providers and family members.
Co-guardians John D. and Julia also seek denial of the order to show cause before the court, or in the alternative, request that the scope of the hearing be limited to whether Ms. Finkel abused the discretion that was granted to her by the court. They argue that the movants, in effect, seek to vacate a prior order of the court, and that no legal basis exists to vacate a prior court order pursuant to Civil Practice Law and Rules § 5015. Specifically, they contend that the movants (1) fail to provide an excusable default for not participating in the proceeding resulting in the final order; (2) make no claim that there is any newly discovered evidence in the possession of Yakov and Anna; (3) make no claim of fraud, misrepresentation or other misconduct of an adverse party; and (4) make no allegations of lack of jurisdiction or of “reversal, modification or vacatur of a prior judgment or order.”
In seeking denial of the order to show cause, the co-guardians also argue that neither the stipulation of settlement, nor the final order, require the special guardian to pursue rehabilitation. The co-guardians also point to Igor’s representation that he discussed the terms of the stipulation of settlement, which the final order is based on, with family members.
*837 Finally, as a basis for their argument that the sole issue to be determined by the court is whether or not the special guardian abused her discretion, the co-guardians rely on a December 13, 2013 ruling made on the record, wherein the court determined that the issue before it is “whether Ms. Finkel complied with the stipulation.”
MHLS, in joining the opposition to the order to show cause, contends that the movants, in effect, seek to vacate the final order, but they are collaterally estopped from challenging Ms. Finkel’s determination. MHLS argues that the order to show cause before the court raises precisely the same issues that were raised by Igor in his 2012 order to show cause, and that these issues were negotiated, settled, and memorialized in the final order. As such, the stipulation of settlement by its terms is res judicata. While Yakov, Anna, and Bella were not parties to the settlement, MHLS argues that there is privity between the movants and Igor based on their familial relationship. MHLS points to Igor’s testimony on the record where he indicated that he consulted with family members regarding the stipulation of settlement.
Like the co-guardians, MHLS requests that any evidence presented to the court at a hearing on the order to show cause consists solely of testimony from Ms. Finkel establishing that her decision was made consistent with the terms set forth in the final order. Finally, MHLS argues that denial of the order to show cause is warranted, in the event that it is construed as a “motion to renew or reargue” under CPLR 2221 (d) and (e). MHLS contends that under CPLR 2221 (d), the movants’ order to show cause should be denied because only parties to a prior proceeding may move to reargue, where a party can establish that the court overlooked or misapprehended the relevant facts, or misapplied a controlling principle of law. MHLS also contends that under CPLR 2221 (e), the movants have failed to offer any justification for their failure to present “new” facts at the time Igor made his prior order to show cause to remove the guardian.
As a threshold matter, the court rejects the assertions of both the co-guardians and MHLS that the movants are barred from contesting the special guardian’s decision to withdraw life-sustaining treatment from Jane Doe pursuant to Public Health Law § 2994-d (4) and (5). The FHCDA specifically *838 provides that “[a]ny person connected with the case[6] . . . [who has objections to the incapacity determination, the choice of surrogate, or the surrogate decisions] may commence a special proceeding . . . with respect to any matter arising under this article.” (Public Health Law § 2994-r [1].) Accordingly, this statutory provision vests the movants, by virtue of their family relationship, with the authority to seek the requested relief, notwithstanding notice of the prior proceeding. For the same reasons, MHLS’s argument that the movants are required to seek intervention under CPLR 401 is without merit.
The court further finds that collateral estoppel does not preclude the movants from seeking the requested relief. “The doctrine of collateral estoppel . . . precludes a party from re-litigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.” (Ryan v New York Tel. Co., 62 NY2d 494, 500 [1984].) The two elements that must be satisfied to invoke the doctrine of collateral estoppel are that (1) the identical issue was decided in the prior action and is decisive in the present action, and (2) the party to be precluded from relitigat-ing the issue had a full and fair opportunity to contest the prior issue (Kaufman v Eli Lilly & Co., 65 NY2d 449 [1985]; see also D’Arata v New York Cent. Mut. Fire Ins. Co., 76 NY2d 659 [1990]). “Preclusive effect, however, will only be given where the particular issue was ‘actually litigated, squarely addressed and specifically decided.’ ” (Crystal Clear Dev., LLC v Devon Architects of N.Y., P.C., 97 AD3d 716, 717-718 [2d Dept 2012], quoting Ross v Medical Liab. Mut. Ins. Co., 75 NY2d 825, 826 [1990].) “Generally, for ‘a question to have been actually litigated’ so as to satisfy the identity requirement, it ‘must have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding.’ ” (D’Arata v New York Cent. Mut. Fire Ins. Co., 76 NY2d 659, 667-668 [1990], supra, quoting Matter of Halyalkar v Board of Regents of State of N.Y., 72 NY2d 261, 268 [1988].)
Here, the current issue before the court is not the identical issue that was previously raised in Igor’s 2012 order to show cause, which sought to remove John D. as personal needs guardian. Yakov, Anna, and' Bella were not parties to the stipulation of settlement and contrary to the contentions raised *839 in opposition, neither of the previous applications address the issue of whether a court appointed guardian complied with Public Health Law § 2994-d (4) and (5), as is the case here. Based on the same rationale, the argument that the movants are, in effect, seeking a vacatur of the final order pursuant to CPLR 5015, is without merit because the instant application raises a new issue which was not previously before this court.
Finally, the court rejects the contention that the movants seek reargument and renewal of the final order pursuant to CPLR 2221 (d) and (e), since the movants do not seek to present “new” facts that the court should have considered before issuance of the final order, nor do the movants contend that the court overlooked or misapprehended the relevant facts, or misapplied a controlling principle of law.
Based on the foregoing, the court finds that the movants have standing to object to the special guardian’s decision to withdraw life-sustaining treatment from Jane Doe, and now considers the merits of the relief requested by the movants, Yakov, Anna, and Bella.
Hearing[7]
In support of the order to show cause, Anna testified on behalf of the moving parties.[8] Yevgeniya B., Semen G. and Raisa F. were also produced by the movants to testify. In opposition, the court heard testimony from the special guardian and Dr. Raj at Mukherji. Additionally, the special guardian submitted into evidence the following: the report dated November 15, 2013, Dr. Jerome Posner’s[9] report dated February 27, 2013, an affirmation dated December 23, 2013 and Dr. Joseph C. Yellin’s December 20, 2013 affidavit.[10]
*840 Summary of Testimony
Anna, Mother of Jane Doe
Jane Doe’s mother, Anna, testified with the assistance of a Russian interpreter. On direct examination, she acknowledged that her daughter was a patient in nursing homes located in both Brooklyn and Queens. She emphasized that she and her husband, Yakov, would visit her daughter at the respective nursing homes during the day and evening, at a minimum of one visit per week.
On cross-examination, when asked whether she recalled the name of the respective nursing homes in Brooklyn or Queens, Anna retorted to counsel that she didn’t need to remember the names of the facilities because she knew their locations.
The court also conducted a brief inquiry of Anna as to whether she was aware of Igor’s previous application and the stipulation of settlement resolving the matter, which resulted in the appointment of a special guardian. Anna acknowledged that she knew about the agreement, however, she stated that Igor merely told her about the agreement, and did not discuss the agreement with her.
Yevgeniya, Sister-in-Law of Jane Doe
On direct examination, Yevgeniya stated that she is the sister-in-law of Jane Doe. Yevgeniya testified that Jane Doe had expressed her wishes regarding end-of-life decision-making on more than one occasion. Yevgeniya recounted a conversation that she had with Jane Doe upon her admission to Victory Memorial Hospital for gallbladder surgery. She stated that this conversation took place “around 1999, plus, minus a year or two.” According to Yevgeniya, she explained to her sister-in-law the meaning of a do not resuscitate (DNR) form, which had been given to her upon admission to the hospital. In refusing to sign the DNR, Jane Doe indicated to Yevgeniya that she wanted her life to be saved under any circumstances. Yevgeniya further testified that Jane Doe expressed the same wishes on multiple hospital admissions afterwards, including her last visit to (Beth Israel) hospital where she was accompanied by her husband, John D.
Yevgeniya stated that she had not testified about Jane Doe’s wishes in prior court procfeedings since there were “tons” of objections to questions and “[she] was only answering the ques *841 tions that were asked.”[11] However, she stated that she called Ms. Finkel twice to tell her about Jane Doe’s end-of-life wishes after the special guardian’s October 2013 meeting with Igor, Yakov and Anna. According to Yevgeniya, Ms. Finkel did not return the phone calls. Yevgeniya further testified that she finally spoke with Ms. Finkel in December and requested a meeting to discuss how Ms. Finkel arrived at her conclusions. Ms. Finkel, however, refused the requested meeting since she had previously scheduled a meeting with Yakov and Anna. Yev-geniya also testified that Ms. Finkel was impolite during the conversation and stated that there is nothing in the world that will stop her from doing this on December 17, 2013.[12] After emphasizing the importance of granting the requested meeting, Yevgeniya testified that Ms. Finkel agreed to meet with her a few days before December 17th. However, Yevgeniya decided not to go to the meeting, and sent Ms. Finkel an email to that effect. Yevgeniya further testified that on the day before the requested meeting with the special guardian, Yakov, Anna, and Bella had a bedside meeting with Ms. Finkel in which the special guardian indicated that she had already made up her mind (regarding her intention to discontinue Jane Doe from life support) and that nothing would stop her. As a result of the bedside meeting, Yevgeniya stated that “I just decided that . . . I’m just not gonna go because I only have one day off. I’m not going to go because it’s going to be all over.”
On cross-examination, after repeated attempts to elicit whether Igor knew about Jane Doe’s prior conversations wherein she expressed her wishes, Yevgeniya testified that she revealed the conversations to Igor in connection with the instant application only. According to Yevgeniya, she did not have “discussions in detail with [Igor] because that’s what [sic] I was instructed not to.” At the same time, Yevgeniya testified that Igor told her that his previous application before the court had been settled, and, in fact, she indicated that she read the settlement.
Upon further cross-examination, Yevgeniya maintained that the special guardian did not discuss her intentions with anyone. At the same time, however, she conceded that she was *842 not at the family meeting with the special guardian. Further, Yevgeniya acknowledged that the two-page email to the special guardian cancelling the requested December meeting, and rebuking Ms. Finkel, Mr. Salzman, and Jane Doe’s malpractice attorneys, omitted any reference whatsoever of Jane Doe’s end-of-life wishes.
Raisa, Yevgeniya’s Mother
On direct examination, Raisa testified through a Russian interpreter for a portion of her testimony, but discontinued using the interpreter after stating that the translations were not accurate. She testified that Jane Doe is her son-in-law’s (Igor) sister. Raisa testified that she had two conversations with Jane Doe in which she expressed her wishes regarding medical treatment. The first conversation took place “possibly [in] the beginning of October 2003,” when she resided in the building adjacent to Jane Doe, and they frequently strolled together in the park. Raisa told Jane Doe of the pain she had been experiencing due to inflammation, but that due to an allergic reaction to anesthesia, she was unable to get treatment for the pain. In response, Jane Doe recommended a surgeon, however, Raisa recounted to Jane Doe her past experience with a surgeon who administered anesthesia that resulted in her being unconscious for five days. Raisa also indicated that while she was unconscious everyone was under the impression that she could not hear, see, or speak, however, in fact, she could hear everything. She stated that due to the adverse reaction to anesthesia she suffers from panic attacks. Raisa further testified that she shared with Jane Doe her ambivalence about having another surgical procedure, for fear that she would find herself in a vegetative state. According to Raisa, Jane Doe indicated that a person always needs to continue living and if something of this sort were to happen to her, that is what she would want.
Raisa further testified that the second conversation took place during the same period of time, but that “[she] didn’t know specifics.” She testified that she recalled this conversation very well because she could not have surgery because of her allergic reaction to anesthesia and was in severe pain and' crying. She stated to Jane Doe that she did not want to live, and Jane Doe responded that if she was similarly situated she would want to live. Raisa asserts that after her daughter, Yev-geniya, retained a new attorney to stop the termination of Jane Doe’s life support, she disclosed to her daughter the prior conversations she had with Jane Doe.
*843 On cross-examination, Raisa stated that one of the conversations with Jane Doe took place in October 2003, when Jane Doe was pregnant. At the same time, she indicated that the first time anyone spoke about the need to remember this conversation was approximately the end of December 2013 or beginning of January 2014. She also conceded that she knew that her son-in-law, Igor, had attempted to stop John D. from terminating life support previously, however that was “a long time ago,” and, in any event, was told that the prior proceeding dealt with removing John D. as guardian, and nothing else. Finally, Raisa testified that no one talked to her or asked about Jane Doe’s wishes prior to December 2013 or January 2014.
Semen, Yakov’s Nephew
Semen testified with the assistance of a Russian interpreter. On direct examination, Semen testified that Yakov is his uncle. He further testified that he spoke with Jane Doe about her wishes in the event that she became ill. He recounted a conversation that took place around 1994, when Jane Doe, together with Julia, lived at the home of Maria, another cousin, and her wheelchair bound husband, Alexander. He indicated that he would visit Maria’s home often since he lived close by, and that he would assist Jane Doe in bringing Alexander up and down the stairs because the apartment building did not have an elevator, and Maria lived on the second floor. Semen testified that one day Jane Doe, Maria, and Bella were in the kitchen talking about how ill Alexander is, and how he wanted to stay alive. According to Semen, Jane Doe stated that if something were to happen to her she would want to live for the sake of her children and relatives.
On cross-examination, Semen acknowledged that the 1994 conversation with Jane Doe wherein she expressed her end-of-life wishes was the sole conversation that they had on the subject. He conceded that he and Jane Doe had no further conversations about her end-of-life wishes between 1994 and 2003.
While Semen stated that he became aware of the instant proceeding more than a month prior to the hearing, he could not remember who told him about it.
At the conclusion of his testimony, Semen’s request to address the court was granted and he stated his opinion that in this circumstance, a mother and father are the only two people that have the right to turn off life support.
*844 Dr. Rajat Mukherji, Jane Doe’s Treating Physician
The special guardian produced Dr. Rajat Mukherji, Jane Doe’s treating physician. He testified that he is a board-certified internist and a fellow in pulmonary and critical care medicine. Presently, he is chief of pulmonology in the Department of Medicine at Kingsbrook Jewish Medical Center, where he treats patients in the ventilator and intensive care unit. He also treats patients in the ventilator unit at Ditmas Park Nursing and Rehabilitation Center and Rutland Park Nursing Home, both of which are affiliated with Kingsbrook.
He testified that Jane Doe has been his patient since her admission to the Ditmas Park’s ventilator unit in 2012, and as her treating physician, he worked with the special guardian to have Jane Doe transferred to Rutland Park. He indicated that Jane Doe’s medical condition can be attributable to anoxic encephalopathy (loss of oxygen), which resulted in cessation of blood flow to the brain. He indicated that she is treated for multiple diagnoses including cardiomyopathy with bradycardia (slow heartbeat), metabolic acidosis, megacolon, a gastrointestinal condition causing distention of the abdomen and gastrointestinal tract, hypertension, and seizure disorder. Generally, he has two formal visits with Jane Doe every month, where he prepares lengthy chart notes, however, if needed, he will visit her more frequently.
Dr. Mukherji testified that his overall role is to keep Jane Doe alive and stated that her treatment regimen includes a daily alkaloid to prevent the buildup of acids in the body; and that to prevent her from filling up with feces, laxatives are regularly given to her to keep the bowels going. Other diagnoses, such as seizures, periodic muscle spasms, bronchial spasms, and electrolyte abnormalities, are treated as they occur. Jane Doe also has a tracheotomy enabling her to receive oxygen from a ventilator, while at the same time permitting suctioning of the tube which has to be cleaned every shift and put back in again. Her hands and fingers are clenched, and her feet are deviated inward. She experiences chronic distention of her abdomen due to the sluggishness of her bowels. He indicated that while Jane Doe can open her eyes and actually have sleep/wake cycles, she is unable to comprehend that her eyes are open. Cognitively, she is totally unaware of what is happening outside and of sensations of any kind. He explained that while she may have reflexes, they are not evidence of hemispheric function or cognitive ability.
*845 Dr. Mukherji agreed with the findings contained in Dr. Posner’s affirmation and medical report which found that Jane Doe has no orientation to noise, no response to threats, and no spontaneous movement of the extremities. He also agreed with Dr. Posner’s findings, based on the magnetic resonance imaging (MRI), that Jane Doe has suffered a major loss of brain tissue consistent with the long-term effect of anoxic encephalopathy. Citing Dr. Posner’s finding that there is no basal ganglia on the MRI, Dr. Mukherji testified that this finding suggests deep-seated damage to the brain, since the basal ganglia are structures above the brain stem which are essential to brain stem function.
Dr. Mukherji opined, with a reasonable degree of medical certainty, that Jane Doe is permanently unconscious and in a persistent vegetative state.
On cross-examination, Dr. Mukherji testified that Jane Doe does not have the cognitive ability to recognize pain, thus, it is difficult to measure her being in pain. While he has never personally observed Jane Doe grimacing (as an indication of pain), he acknowledged that Dr. Yellin’s notes states that she did show some grimacing. He indicated that the treating nurses have the right to administer Tylenol if they feel that Jane Doe may be in pain. At the same time, he also noted that the major reason for prescribing Tylenol is for fever, if it occurs, and acknowledged on redirect examination that there is a dispute in the medical community regarding whether or not a patient in this condition should receive pain medication. He explained that even though Jane Doe may have brain stem function, there is brain stem, spinal cord, and respiratory system damage due to the effects of anoxic encephalopathy. While she can exhibit sensory reflexes in response to stimuli, she is unaware that any form of stimulation is taking place.
Although Jane Doe was previously weaned off the ventilator, Dr. Mukherji testified that, at the present time she is unable to be weaned off the ventilator, in any measure, due to the weakening of her diaphragm and disuse atrophy. According to Dr. Mukherji, Jane Doe’s decreased functionality demonstrates that her overall medical condition has deteriorated. In response to the court’s inquiry as to the life expectancy of Jane Doe given her medical condition, Dr. Mukherji responded that such a patient can generally survive about 7 to 10 years, and added that “it’s surprising that she has survived this long.”
*846 Fern Finkel, Esq., Special Guardian[13]
Ms. Finkel testified in opposition to the order to show cause. She testified that in August 2013, the court appointed her to be the special guardian for Jane Doe pursuant to the final order. As part of her duties under the final order, she undertook a thorough investigation which included an assessment of Jane Doe’s diagnosis, prognosis, functional ability, relationships, and life history. In this regard, Ms. Finkel stated that she reviewed Jane Doe’s medical records, as well as the documents filed in this proceeding. She also conducted interviews of staff at Resort Nursing Home, where Jane Doe had been a patient for six years prior to her transfer to Ditmas Park in late 2012. At Ditmas Park, she interviewed nurses, aides, nutritionists, social workers, respiratory therapists, receptionists and a family member of a patient who shared a room with Jane Doe. Additionally, Ms. Finkel conducted interviews with John D., Julia, Yakov, Anna, and Igor, and telephone interviews with Jacqueline Kadanoff, Esq., and Drs. Rajat Mukherji, Jerome Posner, and Joseph Yellin. She also spoke with attorneys Lisa Boranian, Ira Salzman, Dory Salem and Tzvi Saperstein, and with Court Evaluator, Freida Rosengarten, and with the current and prior Court Examiner.
Ms. Finkel responded affirmatively when asked if she had made the necessary investigative inquiries to invoke surrogate decision-making under Public Health Law § 2994-d (4) and (5). Ms. Finkel stated that her first inquiries were made of the five people who knew Jane Doe prior to the incident — her husband, daughter, parents and brother. Of these five family members, John D. was the only person who affirmatively responded that Jane Doe had a conversation with a friend regarding her end-of-life wishes. However, the friend’s name was not provided by John D., or his attorney. Ms. Finkel concluded that there was insufficient proof of what Jane Doe’s wishes would be regarding health care decision-making. Ms. Finkel also inquired about Jane Doe’s religious and moral beliefs pursuant to Public Health Law § 2994-d (4) (a) (i). After speaking with Jane Doe’s family, Ms. Finkel determined that Jane Doe was born into the Jewish faith but was not religious and not someone who would be bound by strict tenets of orthodoxy.
Since Jane Doe’s wishes could not be ascertained, Ms. Finkel testified that the next line of her investigative inquiry was to *847 determine Jane Doe’s best interests pursuant to Public Health Law § 2994-d (4) (a) (ii), in which she conducted interviews with Ditmas Park medical and nursing personnel, together with family members. Further, she personally visited Jane Doe and reviewed Jane Doe’s medical chart and consulted with Jane Doe’s treating physician, and consulted with Drs. Posner and Yellin to obtain independent medical opinions.
During her bedside visits with Jane Doe, she received no response after calling Jane Doe by name, and touching her face and hand. Jane Doe was similarly unresponsive when asked to blink her eyes or squeeze Ms. Finkel’s hand. Based on these initial observations, Ms. Finkel found that Jane Doe makes no conscious movements, is unable to communicate in any manner, does not follow commands or directions, does not make eye contact, and does not meaningfully respond to stimuli. She analogized Jane Doe’s best interests to what a reasonable person in Jane Doe’s condition would want and found that a reasonable person would not want to be in Jane Doe’s condition. Additionally, Ms. Finkel testified that she determined that Jane Doe is in a persistent vegetative state and is permanently unconscious after consulting with Drs. Mukherji, Posner, and Yellin. Ms. Finkel testified, consistent with the report, that she met the criteria for a surrogate decision under Public Health Law § 2994-d (5) (a) (i) since it is not in Jane Doe’s best interests to continue receiving life-sustaining treatment because she is permanently unconscious with no reasonable expectation of recovery, or of restoration to function at any level.
Ms. Finkel also found that further medical treatment would be an extraordinary burden to Jane Doe under Public Health Law § 2994-d (5) (a) (ii). The special guardian described in copious detail how Jane Doe recoils, spasms, contracts, hyperventilates and perspires after her daily enema, which is given to treat her gastrointestinal symptoms, evidenced by distention of the abdomen. She noted, in particular, that it would take considerable time after, this procedure for her face to stop flushing and the perspiring to stop. Further, Ms. Finkel also testified that Jane Doe grimaces and recoils with any type of movement, and noted that Jane Doe is moved every two hours as a result of being on the respirator, or, as a result of suctioning. In finding that further medical treatment would be burdensome to Jane Doe, Ms. Finkel also cited the opinions of Drs. Mukherji, Posner, and Yellin, who concurred that Jane *848 Doe is permanently unconscious and has no expectation of meaningful recovery to a reasonable degree of medical certainty in accordance with accepted medical standards.
The results of Ms. Finkel’s investigation are contained in the report dated November 15, 2013, in which she indicated her intent to withdraw life-sustaining treatment from Jane Doe pursuant to Public Health Law § 2994-d (4) and (5). Thereafter, Ms. Finkel testified that she proceeded to make the arrangements to implement her decision which included service of the seven-day notice on all interested parties and informing Dit-mas Park. Ms. Finkel also testified that she contacted attorneys Ira Salzman and Tzvi Saperstein, as attorneys for Yakov, Anna, and Igor regarding the decision.
Upon advising Ditmas Park of her decision under Public Health Law § 2994-d (4) and (5), Ms. Finkel was informed that Ditmas Park would not honor her decision to withdraw Jane Doe’s life-sustaining treatment. However, after consulting Dr. Mukherji, the special guardian learned that Rutland Park would not object to her decision. Thereafter, Jane Doe was transferred to Rutland Park to carry out her decision. Ms. Finkel called Mr. Salzman to obtain the consent of the co-guardians for the transfer and Mr. Saperstein to advise of the transfer date. No objections to the transfer were raised by either attorney on behalf of their clients. On December 4, 2013, Jane Doe was transferred from Ditmas Park to Rutland Park, and on December 6, 2013, Ms. Finkel stated that she served a seven-day notice of her intention to withdraw life-sustaining treatment from Jane Doe on Yakov and Anna, attorneys Tzvi Saperstein, David Gibbs, Ira Salzman, Jacqueline Kadanoff, and Lisa Boranian, as well as, Court Evaluator Frieda Rosengarten, Court Examiner Shoshana Myerson, and the administrator of Rutland Park.
A few days after the seven-day notice was served, Ms. Finkel testified that she was contacted by Bella, and for the first time, she was contacted by Igor’s wife, Yevgeniya. While Ms. Finkel acknowledged that her decision as surrogate was made based on all the information presented to her as of November 15, 2013, due to the gravity of her decision, she granted Bella’s request for a bedside visit, along with Yevgeniya’s request for a meeting. On December 11, 2013, Ms. Finkel testified that she had a bedside meeting with Yakov, Anna, and Bella. The meeting quickly became heated and had to be moved into a meeting room, where it lasted about three hours. Contrary to Ms. *849 Finkel’s findings, the family believed that Jane Doe, at times, exhibits signs of responsiveness. Ms. Finkel testified that the family meeting did not change her findings. However, Ms. Finkel arranged to meet with Yevgeniya the day after the family meeting, bnt, Yevgeniya did not show up. Instead, Yevgeniya left a message stating that the meeting was canceled because Ms. Finkel had already made up her mind and was not going to change it.
On cross-examination, Ms. Finkel stated that there was no ethics committee review of her decision, nor did Jane Doe have a health care proxy.
Discussion
Issue Presented
In the case at bar, the court must determine whether the special guardian’s decision to withdraw life-sustaining treatment from Jane Doe complies with the FHCDA, and whether said decision constitutes an abuse of discretion.
Since the enactment of the FHCDA, the majority of cases interpreting the statute involve infants and developmentally disabled patients, who have never had decision-making capacity (Matter of Goldstein [Jean C.], 99 AD3d 1233 [4th Dept 2012]; Matter of Northern Manhattan Nursing Home [A.M.], 32 Misc 3d 754 [Sup Ct, NY County 2011]; Matter of Erie County Med. Ctr. Corp. [Doe], 33 Misc 3d 1208[A], 2011 NY Slip Op 51820[U] [Sup Ct, Erie County 2011]; Matter of Restanio [AG], 37 Misc 3d 586 [Sup Ct, Nassau County 2012]). In Matter of Zornow (31 Misc 3d 450 [Sup Ct, Monroe County 2010], clarified 34 Misc 3d 1208[A], 2011 NY Slip Op 52455[U] [Sup Ct, Monroe County 2011]), a case with similar facts to the case at bar, the court found that under the FHCDA, the ward was obligated to receive artificially administered food and water[14] based on the ward’s religious and moral beliefs coupled with the fact that there was no showing of permanent unconsciousness, life expectancy of less than six months, and irreversible condition. In the within matter, unlike Zornow, the special guardian contends that Jane Doe’s religious and moral beliefs cannot be ascertained, despite claims to the contrary by family *850 members. Thus, this is a case of first impression as the court must review the special guardian’s decision under Public Health Law § 2994-d (4) and (5).
New York Law and the Withdrawal of Life-Sustaining Treatment
Under the common law, “[n]o right [was] held [to be] more sacred . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.” (Union Pacific R. Co. v Botsford, 141 US 250, 251 [1891].) New York law is based on this common-law right, and the courts have consistently adhered to the principle that every human being of adult years' and sound mind has a right to determine what should be done with his own body (Schloendorff v Society of N.Y. Hosp., 211 NY 125 [1914]; Matter of Storar, 52 NY2d 363 [1981], cert denied 454 US 858 [1981]; Matter of Fosmire v Nicoleau, 75 NY2d 218 [1990]; Grace Plaza of Great Neck v Elbaum, 82 NY2d 10 [1993]; Matter of Delio v Westchester County Med. Ctr., 129 AD2d 1 [2d Dept 1987]). Thus, it is well settled law in this state that a patient having decision-making capacity, has the right to consent to or decline life-sustaining treatment (Matter of Storar, Grace Plaza of Great Neck v Elbaum, 82 NY2d 10 [1993], supra; Delio v Westchester County Med. Ctr.). This right has been recognized by the legislature (Public Health Law §§ 2504, 2805-d; CPLR 4401-a).
For patients lacking decision-making capacity, however, the Court of Appeals has consistently ruled that life-sustaining treatment can be withdrawn or withheld only upon a showing of clear and convincing evidence of the patient’s wishes to refuse treatment under specific circumstances (Matter of Storar). In Matter of Eichner (52 NY2d 363 [1981], cert denied 454 US 858 [1981]), the Court approved the request of a patient’s guardian to discontinue the patient’s respirator since it was established by clear and convincing evidence that the patient, when competent, expressed a desire to forgo such measures. By contrast, in Matter of Storar, a companion case, the Court denied the request of the mother of a mentally retarded man to discontinue blood transfusions which would end his life, since the preferences of the patient, who lacked capacity since birth could not be established by clear and convincing evidence. The Court further expounded on this evidentiary standard in the seminal case of Matter of *851 Westchester County Med. Ctr. (O’Connor) (72 NY2d 517, 531 [1988]), by holding that clear and convincing evidence means proof of the patient’s “firm and settled commitment to the termination of life supports under the circumstances like those presented.”
Shortly after the Court of Appeals issued its ruling in Eichner and Storar, Governor Cuomo, recognizing the need to develop public policy regarding the ethical, moral and legal considerations arising from decisions to save and/or prolong life due to advancements in medical technology, convened the New York State Task Force on Life and Law (Task Force) in 1985. The initial Task Force recommendations served as the basis for the passage of New York’s do not resuscitate law[15] and health care proxy law,[16] respectively, which both provide a third party with decision-making ability for individuals lacking capacity, and are commonly referred to as advance directives. Subsequent legislative amendments gave surrogates decision-making authority to withhold or withdraw life-sustaining treatments under these statutes,[17]
Notwithstanding these legislative initiatives, for patients without advance directives and lacking decision-making capacity to forgo life-sustaining treatment, the law remained unchanged — clear and convincing evidence of the patient’s wishes to refuse the same or similar treatment under specific circumstances. The Task Force addressed this issue in its 1992 report, When Others Must Choose: Deciding for Patients Without Capacity.[18] The Task Force acknowledged that “[w]ith passage of the do-not-resuscitate and health care proxy laws, New York State took major strides to address the hard choices posed by decisions for these patients [without advanced directives].”[19] At the same time, the Task Force found that based on the “legal precedents established by the New York [State] Court of Appeals, only the legislature can authorize family members and others close to [a] patient to decide about life-sustaining *852 treatment.”[20] Against this backdrop, the Task Force’s proposals on surrogate decision-making were submitted to the legislature, and after 17 years of debate and compromise the passage of the FHCDA became a reality.[21]
Family Health Care Decisions Act
The FHCDA was signed into law on March 16, 2010.[22] The intent of the statute is to “fill [ ] a gap that remains in New York law” and establish a decision-making process applicable for patients lacking decision-making capacity and without advanced directives in hospitals and nursing homes (L 2010, ch 8, § 1). The statute sets forth the requirements for determining incapacity; provides for the selection of a surrogate deci-sionmaker from a priority list; empowers such surrogates to make health care decisions for patients who lack capacity and who have not otherwise appointed an agent to make health care decisions; requires the surrogate to adhere to the substituted judgment/best interests standard; and limits the circumstances in which a surrogate may authorize the withholding or withdrawal of life-sustaining treatment.[23] Under the statute, a determination of incapacity can be made pursuant to court order, upon the appointment of an article 81 guardian[24] for health care decisions or pursuant to a medical determination by a physician (Public Health Law § 2994-c). Public Health • Law § 2994-d sets forth, in order of priority, a list of persons who can be designated as surrogate for the purpose of surrogate decision-making:
1. A court appointed guardian;
2. A spouse or domestic partner (as defined in the FHCDA).;
*853 3. A son or daughter (18 years of age or older);
4. A parent;
5. A brother or sister (18 years of age or older); and
6. A close friend.
If a person with higher priority on the list declines to act, then the next person on the list, in order of priority, has the right to act. In order for a surrogate to make a decision regarding life-sustaining treatment the statutory mandate is twofold and requires that the criteria in both Public Health Law § 2994-d (4) and (5) be met.
Public Health Law § 2994-d (4) provides that health care decisions be made:
“(a) (i) in accordance with the patient’s wishes, including the patient’s religious and moral beliefs; or
“(ii) if the patient’s wishes are not reasonably known and cannot with reasonable diligence be ascertained, in accordance with the patient’s best interests. An assessment of the patient’s best interests shall include: consideration of the dignity and uniqueness of every person; the possibility and extent of preserving the patient’s life; the preservation, improvement or restoration of the patient’s health or functioning; the relief of the patient’s suffering; and any medical condition and such other concerns and values as a reasonable person in the patient’s circumstances would wish to consider.
“(b) In all cases, the surrogate’s assessment of the patient’s wishes and best interests shall be patient-centered; health care decisions shall be made on an individualized basis for each patient, and shall be consistent with the values of the patient, including the patient’s religious and moral beliefs, to the extent reasonably possible.” (Emphasis added.)
Public Health Law § 2994-d (5) further provides that
“[i]n addition to the standards set forth in subdivision four of this section, decisions by surrogates to withhold or withdraw life-sustaining treatment . . . shall be authorized only if the following conditions are satisfied, as applicable:
“(a) (i) Treatment would be an extraordinary burden to the patient and an attending physician determines, with the independent concurrence of *854 another physician, that, to a reasonable degree of medical certainty and in accord with accepted medical standards, (A) the patient has an illness or injury which can be expected to cause death within six months, whether or not treatment is provided; or (B) the patient is permanently unconscious; or “(ii) The provision of treatment would involve such pain, suffering or other burden that it would reasonably be deemed inhumane or extraordinarily burdensome under the circumstances and the patient has an irreversible or incurable condition, as determined by an attending physician with the independent concurrence of another physician to a reasonable degree of medical certainty and in accord with accepted medical standards.” (Emphasis added.)
In the case at bar, it is undisputed that the FHCDA applies to Jane Doe. The court by order ánd judgment dated July 11, 2006 adjudged Jane Doe to be an incapacitated person. The uncontroverted medical evidence produced at the hearing, which includes the testimony of Jane Doe’s attending physician, Dr. Mukherji, and the concurring report of Dr. Yellin, further establishes that Jane Doe presently lacks decision-making capacity.[25] Additionally, Jane Doe is a patient in a nursing home as a result of her incapacity and has no advance directives.
In the context of Public Health Law § 2994-d and Mental Hygiene Law article 81, John D. is vested with the statutory authority to act as Jane Doe’s surrogate, since he stands in the two highest positions on the priority list, personal needs guardian and spouse of Jane Doe. However, under the terms of the stipulation of settlement with Igor, John D. delegated his statutory rights to the special guardian to act as Jane Doe’s surrogate pursuant to Public Health Law § 2994-d (1). The court finds that John D.’s delegation of rights to Ms. Finkel, as special guardian, is consistent with the statutory purpose of the FHCDA, and is thus, permissible (see Public Health Law § 2994-d [3] [b]; [4] [b]).
In reviewing the special guardian’s decision to withdraw life-sustaining treatment from Jane Doe under the FHCDA, *855 the court must first determine, pursuant to Public Health Law § 2994-d (4) (a) (i), whether Jane Doe’s end-of-life wishes can be reasonably ascertained. The record indicates that, in this regard, Ms. Finkel first considered Jane Doe’s religious and moral beliefs. The results of her investigation revealed that Jane Doe is Jewish by birth, but that she is non-observant, since she did not attend temple, observe the Sabbath or keep a kosher home. This finding was not disputed by the movants. Based on these findings, Ms. Finkel properly determined that Jane Doe’s religious beliefs were not instructive as to whether to withdraw life-sustaining treatment.
Further, the special guardian sought to ascertain Jane Doe’s values from which her end-of-life wishes could be inferred. In this regard, the court considers the testimony of Anna, Jane Doe’s mother, and finds that it is not probative regarding this inquiry. Additionally, while the special guardian did not delineate the specific results of her interview with Frieda Rosengarten (the Court Evaluator in the 2012 proceeding), a review of the Court Evaluator’s report,[26] indicates that Jane Doe valued family, despite differences with members of her nuclear family unit. Based on the evidence before the court, Ms. Finkel properly determined that the information obtained from the Court Evaluator’s report was insufficient to infer Jane Doe’s end-of-life wishes.
Next, the special guardian conducted interviews with all interested parties to determine if Jane Doe specifically expressed her end-of-life wishes prior to her incapacity. Ms. Finkel testified credibly that she made inquiries of the mov-ants, the family, and their respective attorneys regarding Jane Doe’s end-of life wishes. In response to Ms. Finkel’s inquiries, John D. was the only individual to provide relevant information, by informing her of a conversation Jane Doe had with a friend about her wishes. Upon further inquiry, however, Ms. Finkel was not provided with the friend’s name or contact information.
While Yevgeniya, Semen, and Raisa each testified as to conversations with Jane Doe regarding her end-of-life wishes, the court questions the veracity of these conversations, the disclosure of which curiously coincides with the service of the seven-day notice. The substance of their respective conversa *856 tions, is that, if sick, Jane Doe wanted to continue to live and wanted her life to be saved under any circumstances. The witnesses, however, have a vague recollection of when these conversations took place. The conversation with Yevgeniya was purportedly made in response to Jane Doe’s refusal to sign a DNR in a hospital setting, and took place “around 1999, plus, minus a year or two.” Raisa stated that she had two conversations with Jane Doe, the first “possibly [in] the beginning of October 2003,” and the second conversation took place during the same period of time, but that “[she] didn’t know specifics.” Raisa’s conversations with Jane Doe took place on a park bench and appeared to be a knee-jerk reaction to Raisa’s adversity to doctors and medicine. Similarly, Semen’s claimed conversation with Jane Doe took place around 1994, again on a park bench, and appeared to be precipitated by the plight of a wheelchair bound family member. Taken as a whole, the circumstances under which these conversations took place coupled with their indefiniteness and sporadic nature, lack the deliberation and level of persistent commitment that the Court relied on in Eichner, to authorize the discontinuance of the respirator for a patient in a vegetative state. Accordingly, the court finds that these conversations are insufficient to establish that Jane Doe articulated her end-of-life wishes to Yevgeniya, Semen, or Raisa.
The court also rejects the claims of the movants who contend that the special guardian failed to consider Jane Doe’s end-of-life wishes. The credible evidence establishes that due to the gravity of her responsibility, the special guardian made her continued availability known to the attorneys, family members, and medical personnel throughout her investigation. To this end, even after the special guardian issued the report dated November 15, 2013, she agreed to a bedside meeting at Rut-land Park, with Yakov, Anna and Bella. Moreover, both Semen and Raisa fail to explain why these conversations with Jane Doe were not brought to the attention of Jane Doe’s family members, any attorney for the family members, or the special guardian.
Additionally, the court finds Yevgeniya’s claims that Ms. Fin-kel “had made up her mind” regarding the withdrawal of Jane Doe’s life support to be disingenuous and incredible. Yevgeniya summarily rejected the opportunity to have a meeting with Ms. Finkel to discuss Jane Doe’s wishes, and failed to mention any information about Jane Doe’s end-of-life wishes in the *857 email sent to Ms. Finkel canceling the meeting. The court notes that Yevgeniya was also personally aware that her husband, Igor, consented to the appointment of a special guardian for surrogate decision-making for Jane Doe and chose not to participate in interviews that Ms. Finkel had with the family, which included her husband, Igor.
Based on the credible evidence adduced at the hearing, together with the results of the special guardian’s investigation, the court finds that the special guardian correctly determined that Jane Doe’s end-of-life wishes could not be reasonably ascertained pursuant to Public Health Law § 2994-d (4) (a) (i).
The court must now review, pursuant to Public Health Law § 2994-d (4) (a) (ii), whether Ms. Finkel’s decision to withdraw life-sustaining treatment is in Jane Doe’s best interests. Public Health Law § 2994-d (4) (a) (ii) provides that
“[a]n assessment of the patient’s best interests shall include: consideration of the dignity and uniqueness of every person; the possibility and extent of preserving the patient’s life; the preservation, improvement or restoration of the patient’s health or functioning; the relief of the patient’s suffering; and any medical condition and such other concerns and values as a reasonable person in the patient’s circumstances would wish to consider.”
The application of the best interests standard, is often understood to reflect a societal consensus, or a “reasonable person,” choosing as most people would choose for themselves.[27] According to the Task Force’s report, under the best interests standard, the surrogate is required to objectively assess the relative benefits and burdens of available treatment options;[28] a patient’s best interests should be determined as far as possible from the perspective of the patient, not that of the deci-sionmaker;[29] and to make this assessment the surrogate must consult with health care professionals who have a responsibility to further the well-being of the patient.[30] The Task Force report is instructive on the application of the best interests standard as the recommendations contained therein served as *858 a basis for the criteria for surrogate decision-making set forth in the FHCDA.
In the case of Jane Doe, the record establishes that the special guardian consulted Dr. Jerome B. Posner and Dr. Yellin, both of whom are board-certified neurologists together with Dr. Mukherji, a board-certified internist and Jane Doe’s treating physician. Dr. Posner opined to a reasonable degree of medical certainty, that based on his examination of Jane Doe in 2012, and his review of an MRI performed in July of the same year, Jane Doe is in a persistent vegetative state without possibility of recovery. Dr. Posner based his conclusion on: (1) Jane Doe’s medical history established that she has been in a persistent vegetative state for several years; (2) an examination of Jane Doe found no evidence of even minimal cognitive function; and (3) the MRI which shows extensive tissue destruction that is incompatible with any degree of consciousness. Similarly, Dr. Yellin, upon examination, diagnosed Jane Doe with anoxic encephalopathy resulting in a persistent vegetative state. He opined to a reasonable degree of medical certainty that Jane Doe is permanently unconscious and her diagnosis is permanent and irreversible. The opinions of both these consulting physicians are consistent with Dr. Mukherji who also opined to a reasonable degree of medical certainty, that Jane Doe’s condition is permanent and that there is no treatment modality that would improve her physical or mental condition.
Based on the uncontroverted medical evidence and results of her investigation, the special guardian determined that Jane Doe lacks participation, understanding, comprehension, awareness or reaction to any meaningful stimuli, other than discomfort stimuli which manifests in physical spasm, hyperventilation or recoiling from pain; she is unresponsive to meaningful stimuli and has been ventilator dependent and in a persistent vegetative state since 2003; exhibits no conscious action or participation in life; exists in a vegetative and permanently unconscious state; does not make conscious movements, her limbs do not move except in spasm or to recoil, or if moved by caretakers; she is unable to communicate in any manner, does not follow commands or directions, and does not make eye contact. Despite their contentions to the contrary, the movants have failed to provide any objective medical evidence that Jane Doe exhibits any sign of consciousness or will improve with rehabilitation.
In discussing the application of the best interests standard to surrogate decision-making, in its publication, Ethics and *859 Clinical Practice Guided by the Family Health Care Decisions Act,[31] the New York City Health and Hospitals Corporation Bioethics Council (HHC Bioethics Council) explains that “[m]edical care often imposes pain and suffering in exchange for a promised benefit, amelioration of prior pain or chance of enhanced quality of life. But these benefits may not be available to balance the burdens of treatment.”[32] Sadly, in the case of Jane Doe, the special guardian’s findings establish that there are no physical or mental benefits associated with medical intervention by continuing life-sustaining treatment for Jane Doe. Prolongation of life for Jane Doe could only mean that she is hooked up to a mechanical ventilator and monitors; receives artificial nutrition and hydration through a feeding tube; is subject to physical intrusion on a daily basis to ensure the functioning of her vital organs, and is wholly dependent on others for the most intimate of bodily functions. As Ms. Finkel recounted in her testimony,
“I cannot imagine any reasonable person having spent one time with her, let alone the seven visits that I made, anybody ever wanting to be in that condition without an expectation or really any expectation of a meaningful recovery. Her [Jane Doe’s] life is lying in a bed with tubes and suctioning, beeps and buzzes going off because her functions are constantly being thrown out of whack.”
In its discussion of implementing the FHCDA, HHC Bioethics Council emphasizes that “[i]t is especially important in considering the notion of ‘best interest[s]’ that the medical team be both honest and clear, as it is supportive and comforting.”[33] Significantly, the court notes that, Dr. Mukherji, as a health care provider under the statute, had the option of refusing to honor the special guardian’s decision (see Public Health Law § 2994-n [2] [b]). Instead, upon Ditmas Park’s refusal to honor the special guardian’s decision, Dr. Mukherji facilitated Jane Doe’s transfer from Ditmas Park to Rutland Park, where he had privileges. It can be inferred, therefore, that Dr. *860 Mukherji did not oppose the special guardian’s decision to have Jane Doe’s life-sustaining treatment withdrawn.
Based on a review of the record, the court finds that Ms. Finkel’s decision to withdraw life-sustaining treatment from Jane Doe satisfies the best interests standard set forth in Public Health Law § 2994-d (4) (a) (ii).
The court now considers whether the special guardian’s decision to withdraw life-sustaining treatment from Jane Doe complies with Public Health Law § 2994-d (5), which has two tests. Life-sustaining treatment can be withdrawn or withheld if either test is met. Public Health Law § 2994-d (5) (a) (i) requires a finding that treatment would be an extraordinary burden to the patient and concurring medical opinions that the patient is permanently unconscious. Ms. Finkel’s determination that Jane Doe’s continued treatment on the respirator would be excessively burdensome is supported by the evidence. This is a subjective determination to be made by the surrogate.[34] By specifying the part of the determination that the physicians have to make, the statute implicitly leaves it up to the surrogate to make the other part of the determination. Additionally, consistent with the statute, concurring medical opinions by Dr. Mukherji, Jane Doe’s treating physician, and Dr. Yellin, establish to a reasonable degree of medical certainty that Jane Doe is permanently unconscious.
Public Health Law § 2994-d (5) (a) (ii) requires a finding that the provision of treatment would involve such pain, suffering or other burden that it would reasonably be deemed inhumane or extraordinarily burdensome under the circumstances and the patient has an irreversible or incurable condition, as determined by an attending physician with the independent concurrence of another physician to a reasonable degree of medical certainty and in accord with accepted medical standards. While the special guardian submitted evidence to establish that “[t]he provision of treatment would involve such pain, suffering or other burden that it would reasonably be deemed inhumane or extraordinarily burdensome under the circumstances,” the evidence relied upon by the special guardian did not establish whether a patient in a persistent vegetative state is able to feel pain (id.). Additionally, Drs. Mukherji and Yellin did not opine to any degree of medical certainty that *861 Jane Doe’s current treatment involves such pain, suffering or other burden that it would be reasonably inhumane or extraordinarily burdensome under the circumstances to continue treatment.
Based on a review of the record, the court finds that the special guardian’s decision to withdraw life-sustaining treatment from Jane Doe complies with Public Health Law § 2994-d (5) (a) (i) but does not comply with the criteria set forth in Public Health Law § 2994-d (5) (a) (ii).[35] However, the special guardian’s compliance with Public Health Law § 2994-d (5) (a) (i) alone is sufficient to withdraw life-sustaining treatment from Jane Doe.
Conclusion
State courts throughout the nation have grappled with the issues raised by the advancement of medical technology which effect the prolongation of life and the timing of death (see Cruzan v Director, Mo. Dept. of Health, 497 US 261 [1990]). In response, state legislatures have acknowledged the view expressed by the United States Supreme Court that “[b]road policy questions bearing on life and death are more properly addressed by representative assemblies” {id. at 269). Accordingly, in the decades since the initial Task Force report, surrogate consent statutes have become the new paradigm. In fact, the majority of jurisdictions have adopted a variation of such statutes permitting surrogates to make decisions regarding the withdrawal or withholding of life-sustaining treatment, subject to a variety of safeguards.[36]
*862 The FHCDA, New York’s surrogate consent statute, affords patients significant safeguards and is one of the more comprehensive statutes in existence as it requires the attending physi-. cian and an independent physician to make specific clinical findings; requires the surrogate to make certain nonclinical findings about the burdens of the treatment; obligates the surrogate to base his decision on the patient’s wishes if known or else the patient’s best interests; and allows persons connected to the case to challenge a decision.[37] Specifically, the clear and convincing evidentiary standard resulting from the “presumption of life” inference relied on in New York’s decisional case law which protects against error has been replaced with a legal and medical framework that allows a surrogate to make decisions based on a holistic assessment of the patient including his wishes, values, and beliefs. In circumstances where the patient has no advance directives and did not communicate his end-of-life wishes prior to losing capacity, the patient’s best interests is an additional consideration. The court finds that the legal and medical framework of the FHCDA, together with the safeguards provided for therein, is sufficient to protect against error and permits the best interests of the patient to coexist with the best practices of medicine, and at the same time affords the patient adequate safeguards.
Judicial review of the special guardian’s decision has been requested by the movants, a task which the court has not taken lightly. The tragic events of 2003 resulting in Jane Doe’s medical condition have created a familial divide. On the one hand, John D., Julia, and Igor consented to the appointment of a special guardian for surrogate decision-making pursuant to Public Health Law § 2994-d (4) and (5). However, neither Igor *863 nor his attorney appeared in the instant proceeding. On the other hand, Igor’s wife, Yevgeniya, with the acquiescence of Yakov, Anna and Bella retained counsel and commenced the instant proceeding to challenge the special guardian’s decision under the statute.
Most 37 year olds like Jane Doe are unlikely to contemplate being permanently unconscious for a period of nine years and counting. Based on the evidence, the sole benefit of medical treatment for Jane Doe is to be kept metabolically alive since she has suffered extensive tissue destruction of the brain which is incompatible with any degree of recovering consciousness in the future. Thus, disability is total and no return to an even minimal level of social or human functioning is possible. The court’s conclusion is consistent with the spirit of the statute expressed by the HHC Bioethics Council: “[t]he practice of medicine should not be governed by the ‘technological imperative’ [because it exists it must be employed]”[38] “[i]n order for an intervention to be in the best interest [s] of the patient, it must advance the health and well being, and not simply extend individual organ function in light of a failing organism.”[39]
The court is also guided by Ms. Boranian, counsel for Jane Doe, who does not oppose the special guardian’s decision. Ms. Boranian’s position is based on consultations with Dr. Posner and numerous visits with Jane Doe wherein she concluded that Jane Doe is devoid of thought, emotion and sensation, and thus, has no reasonable expectation of life.
It is important to note that while the movants contend otherwise, the court finds that Ms. Finkel, as special guardian for Jane Doe, fulfilled her responsibilities as set forth in the final order in good faith. As' a long-standing practitioner and lecturer in the area of elder law, Ms. Finkel’s decision to withdraw life-sustaining treatment from Jane Doe was made only after conducting a full investigation and upon careful deliberation of the results thereof, Specifically, she considered the concurring clinical opinions of not only two physicians as statutorily required, but three physicians in support of her findings under the statute. Further, she discussed her decision with Jane Doe’s immediate family, extended family, and their attorneys, and provided notice of her decision pursuant to *864 Public Health Law § 2994-d (5) (e). In the face of resistance and hostility exhibited by some family members, Ms. Finkel remained committed to enforce the clear intent of the FHCDA, which is that surrogate decision-making shall be “patient centered.” Accordingly, in reviewing the record in this tremendously sensitive and difficult matter, the court is satisfied that the special guardian complied with the statutory criteria set forth in Public Health Law § 2994-d (4) and (5).
Based on the foregoing, the court finds that the special guardian’s decision to withdraw life-sustaining treatment from Jane Doe complied with Public Health Law § 2994-d (4) (5) (a) (i), and therefore, did not constitute an abuse of discretion.
Accordingly, it is hereby, ordered, that the instant order to show cause is denied in its entirety.

. By order of this court dated February 13, 2013, the court ruled that the named party in this proceeding and her spouse be referred to as “Jane Doe” and “John D.,” respectively. Based on the sensitive nature of the issues raised herein, the court will refer to all other interested parties and witnesses, except for medical providers, by first name only.

. Life-sustaining treatment is defined as “any medical treatment or procedure without which the patient will die within a relatively short time, as determined by an attending physician to a reasonable degree of medical certainty.” (Public Health Law § 2994-a [19].)

. Since Jane Doe is unable to swallow, a percutaneous endoscopic gastros-tomy, commonly referred to as a “PEG” or feeding tube, has been inserted through her abdominal wall and into her stomach. A PEG allows nutrition, fluids and/or medications to be put directly into the stomach, bypassing the mouth and esophagus.

. Renowned neurologist Dr. Fred Plum created the term “persistent vegetative state” and is the author of several treatises and numerous articles explaining it as follows:
“Personality, memory, purposive action, social interaction, sentience, thought, and even emotional states are gone. Only vegetative functions and reflexes persist. If food is supplied, the digestive system functions and uncontrolled evacuation occurs; the kidneys produce urine; the heart, lungs, and blood vessels continue to move air and blood; and nutrients are distributed in the body.” (See also Matter of Quinlan, 70 NJ 10, 24-25, 355 A2d 647, 654-655 [1976] [Dr. Plum’s similar explanation of the vegetative state]; President’s Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment at 174-175 [1983].)

. Dr. Jerome Posner was appointed to conduct an independent neurological medical exam of Jane Doe and prepared a report dated February 27, 2013 containing his findings in the 2012 action brought by Igor.

6. “ ‘Person connected with the case’ means . . . any person on the surrogate list” (Public Health Law § 2994-a [26]).

. At the commencement of the hearing, the parties consented to the special guardian producing evidence in support of her position prior to the presentation of evidence to be submitted in support of the order to show cause by the moving parties. While the court permitted the special guardian to proceed prior to the movants on the order to show cause, the movants still have the burden of proof on the issue of the special guardian’s compliance with the Public Health Law.

. Based on the representation of counsel, Yakov did not appear for the proceeding due to a health condition.

. The special guardian consulted with Dr. Posner, the court appointed neurologist in the 2012 proceeding.

. At the request of Dr. Mukherji, Dr. Yellin performed neurological consultations of Jane Doe at Ditmas Park. The special guardian also consulted Dr. Yellin.

. Yevgeniya had previously testified at the hearing resulting from Igor’s emergency application to have John D. removed as personal needs guardian in 2012.

. Referring to the date set forth in the seven-day notice for the withdrawal of life-sustaining treatment.

. Ms. Finkel’s testimony also includes reference to the report dated November 15, 2013.

. Pursuant to Public Health Law § 2994-d (5) (d), providing nutrition and hydration orally, without reliance on medical treatment, is not health care under this statute and is not subject to this article. However, under the statute artificially administered food and water by surgical procedure can be considered life-sustaining treatment.

. Public Health Law §§ 2960-2978.

. Public Health Law §§ 2980-2994.

. Public Health Law, art 29-B, § 2965, as amended by L 1991, ch 370, §§ 4 to 8, L 2010, ch 8, §§ 10 to 12, eíf June 1, 2010; Public Health Law, art 29-C, § 2982, as amended by L 1991, ch 370, § 18, L 2004, ch 230, § 27, eff July 27, 2004.

. New York State Task Force on Life and the Law, When Others Must Choose: Deciding for Patients Without Capacity (Mar. 1992).

. Id. at ix (Executive Summary).

. Id. at 76.

. In 1993 the Task Force’s proposals were sent to the legislature. Despite strong support among a diverse group of organizations, opposition to the FHCDA by special interest groups impeded its passage. Over the course of 17 years the bill was introduced in the Senate, only to be stymied in committee. In 2009, Senator Thomas Duane (D-Manhattan) became Chair of the Senate Health Committee and introduced a compromise bill that resulted in the passage of the FHCDA.

. L 2010, ch 8, § 2, adding Public Health Law art 29-CC (Family Health Care Decisions Act).

. For a comprehensive discussion of the FHCDA, see Robert N. Swidler, New York’s Family Health Care Decision Act, NY St Bar Assn J 18 (June 2010).

. Article 81 of the Mental Hygiene Law was also amended, in 2010, to direct that health care decisions by a personal needs guardian be made in accordance with the standards set forth in the FHCDA (Mental Hygiene Law § 81.22 [a] [8] [i], as amended by L 2010, ch 8, § 25 [eff June 1, 2010]).

. Public Health Law § 2994-a (5) defines decision-making capacity as “the ability to understand and appreciate the nature and consequences of proposed health care, including the benefits and risks of and alternatives to proposed health care, and to reach an informed decision.”

. The court takes judicial notice of the Court Evaluator’s report dated February 13, 2016.

. New York State Task Force on Life and the Law, When Others Must Choose: Deciding for Patients Without Capacity 35 (Mar. 1992).

. Id.

. Id. at 55.

. Id. at 109.

. New York City Health and Hospitals Corporation Bioethics Council is comprised of all the chairpersons of ethics committees at each of the hospitals and long-term care facilities of the New York City Health and Hospitals Corporation.

. Matthew Varughese et al., Ethics and Clinical Practice Guided by the Family Health Care Decisions Act, 16 NY St Bar Assn Health L J 79 (2011).

. Id.

. New York State Bar Association, Frequently Asked Questions About the Family Health Care Decisions Act, http://www.nysba.org/ CustomTemplates/content.aspx?id=26462 (last revised Jan. 9, 2011).

. An ethics committee review is not required because the special guardian’s decision to withdraw life-sustaining treatment does not comply with Public Health Law § 2994-d (5) (a) (ii).

. Alabama, Ala Code §§ 22-8A-1 to 22-8A-14; Alaska, Alaska Stat §§ 13.52.010 to 13.52.395; Arizona, Ariz Rev Stat Ann §§ 36-3201 to 36-3231; Arkansas, Ark Code Ann §§ 20-6-101 to 20-6-118; Colorado, Colo Rev Stat Ann §§ 15-18-101 to 15-18.7-110; Connecticut, Conn Gen Stat Ann §§ 19a-570 to 19a-580g; Delaware, Del Code Ann, tit 16, §§ 2501 to 2518; District of Columbia, DC Code §§ 21-2201 to 21-2213; Florida, Fla Stat Ann §§ 765.101 to 765.113; Georgia, Ga Code Ann §§ 31-9-1 to 31-9-7; Hawaii, Haw Rev Stat §§ 327E-1 to 327E-16; Idaho, Idaho Code Ann §§ 39-4501 to 39-4515; Illinois, 755 ILL Comp Stat 40/1 to 40/65; Indiana, Ind Code Ann §§ 16-36-1-1 to 16-36-1-14; Iowa, Iowa Code Ann §§ 144A.1 to 144A.12; Kentucky, Ky Rev Stat Ann §§ 311.621 to 311.644; Louisiana, La Rev Stat Ann §§ 40:1151 to 40:1151.9; Maine, Me Rev Stat Ann, tit 18-A, §§ 5-801 to 5-817; Maryland, Md Code Ann, Health — Gen §§ 5-601 to 5-626; Michigan, Mich Comp Laws Ann §§ 333.5651 to 333.5661; Mississippi, Miss Code Ann §§ 41-41-201 to *862 41-41-303; Montana, Mont Code Ann §§ 50-9-101 to 50-9-111; Nevada, Nev Rev Stat §§ 449.535 to 449.690; New Hampshire, NH Rev Stat Ann ch 137-J; New Mexico, NM Stat Ann §§ 24-7A-1 to 24-7A-18; North Carolina, NC Gen Stat §§ 90-320 to 90-328; North Dakota, ND Cent Code §§ 23-12-01 to 23-12-19; Ohio, Ohio Rev Code Ann §§ 2133.01 to 2133.16; Oregon, Or Rev Stat §§ 127.505 to 127.660; Pennsylvania, 20 Pa Stat Ann §§ 5451 to 5461; South Carolina, SC Code Ann §§ 44-66-10 to 44-66-80; South Dakota, SD Codified Laws §§ 34-12C-1 to 34-12C-8; Tennessee, Tenn Code Ann §§ 68-11-1801 to 68-11-1815; Texas, Tex (Health & Safety) Code Ann §§ 166.031 to 166.053; Utah, Utah Code Ann §§ 75-2a-101 to 75-2a-125; Virginia, Va Code Ann §§ 54.1-2981 to 54.1-2993; Washington, Wash Rev Code Ann §§ 7.70.010 to 7.70.160; West Virginia, W Va Code Ann §§ 16-30-1 to 16-30-25; Wyoming, Wyo Stat Ann §§ 35-22-401 to 35-22-416.

. Robert N. Swidler, New York’s Family Health Care Decision Act, NY St Bar Assn J 18 (June 2010).

. Matthew Varughese et al., Ethics and Clinical Practice Guided by the Family Health Care Decisions Act, 16 NY St Bar Assn Health L J 79 (2011), supra.

. Id.